UNITED STATES of America

v.

Mario DI BELLA and Samuel Panzarella, Defendants.

Misc. 2225.

United States District Court
E. D. New York.

Nov. 4, 1959.

Jerome Lewis, Brooklyn, N. Y., Attorney for defendant Mario DiBella, for the motion.

Cornelius W. Wickersham, Jr., U. S. Atty., Brooklyn, N. Y. by Charles L. Stewart, Asst. U. S. Atty., Brooklyn, N. Y., in opposition.

RAYFIEL, District Judge.

The defendant, Mario DiBella, moves under Rule 41(e) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., to suppress all evidence seized in his apartment at 35–15 80th Street, Jackson Heights, Queens County, New York, on March 9, 1959 by agents of the Federal Bureau of Narcotics, as well as any and all evidence gleaned therefrom, on the ground that the search and seizure was unlawful, being violative of the Fourth Amendment of the Constitution of the United States and of Rules 3 and 4 of said Rules.

The defendant bases his motion on the following three grounds:

1. that the warrant of arrest was invalid because the complaint on which it was based did not state facts sufficient to show probable cause;

2. that his arrest under said warrant was used as a pretext to make an exploratory search of the defendant's apartment; and

3. that the warrant was invalid because it bore the date October 6, 1958, while the complaint on which it was based was dated October 15, 1958.

As to the third ground, it is palpable that the error in date was inadvertent. Both the warrant and the complaint on which it was based, were *originally* dated October 6, 1958. The date on the complaint was changed in ink to October 15, when it was sworn to before Commissioner Epstein. The date on the warrant, however, was not changed and was thus signed by the Commissioner. This was clearly an oversight and should and does not affect the validity of the warrant, which obviously, was issued on October 15, 1958. As a matter of fact defendant's counsel, in the statement of

undisputed facts contained in his brief, alleges "1. That on the *15th* day of October, 1958 a warrant was issued * * *." (Emphasis supplied.)

As to the failure of the complaint to state facts showing *probable cause.*

The complaint alleges on *information and belief* that "the defendants, *Mario DiBella* and *Samuel Panzarella*, did on September 10, 1958, at Jackson Heights, Long Island, New York, within the Eastern District of New York, unlawfully sell, dispense and distribute a narcotic drug, to wit: approximately one ounce of heroin hydrochloride, a derivative of opium * * *."

The following paragraph states "That the source of your deponent's information and the grounds for his belief are *your deponent's personal observations in this case,* the statements of Samuel Panzarella, and other witnesses in this case, and the reports and records of the Bureau of Narcotics." (Emphasis added.)

Doubtless the complaint was inexpertly drawn. It alleges, *on information and belief,* that the sale of the heroin took place on September 10, 1958, and then goes on to say that the *source* of the complainant's information and *grounds* for his belief are, among other things, *his own observations.* Obviously, if the sources of his information were his own observations, then he had *personal knowledge* of the facts.

I have read the statements of Agents Costa and Moynihan which are set forth in Appendix B and C, attached to the affidavit submitted in opposition to this motion by Assistant United States Attorney Charles L. Stewart. Those statements were originally attached to an application for a search warrant made before Commissioner Abruzzo, who denied the same. I have considered them as having been submitted in opposition to this motion.

Agent Moynihan's statement alleges that he had met one Samuel Panzarella, a codefendant of DiBella, who offered to sell him heroin, the sale to take place at 8:00 a. m. on August 26, 1958; that he met Panzarella in Manhattan at 6:00 a. m. on that day and was told by him that he wanted to call his source of supply, whereupon Panzarella made a telephone call, after which he and the agent drove to 79th Street, north of Roosevelt Avenue, in Jackson Heights, Queens, New York, where they parked; that Panzarella then left the vehicle, walked to 79th Street and 37th Avenue, and entered a green Chrysler automobile bearing New York license number 6971 NE; that he observed Panzarella leave that vehicle several minutes later at 79th Street and Roosevelt Avenue and return to the car in which he, the agent, was waiting, after which Panzarella handed him a glassine envelope containing a white powder, which subsequent tests proved to be an ounce of heroin hydrochloride. That on September 10, 1958 a similar series of events occurred: at 9:30 p. m. on that day he met Panzarella in Manhattan, was told by him that he would have to go to Jackson Heights to meet his source of supply, and after Panzarella made a telephone call they both went to 74th Street and Roosevelt Avenue; Panzarella then left the agent, met the defendant Mario DiBella, walked with him from 74th Street to 37th Road and then returned to the agent; they both drove back to Manhattan, and enroute Panzarella handed him a glassine envelope containing heroin hydrochloride, and stated to him that DiBella was his source of supply and had supplied the heroin which had been sold to the agent on August 26, 1958 and September 10, 1958.

Agent Costa's affidavit alleges that on August 26, 1958, at 7:30 a. m. he saw the defendant Mario DiBella leave the premises at 35–15 80th Street, Jackson Heights, enter his Chrysler automobile, license number 6971 NE, drive to 37th Avenue and 79th Street where he met Panzarella, who entered the car, and DiBella then drove to Roosevelt Avenue and 79th Street, where Panzarella left the car and walked to 78th Street, where he met Agent Moynihan, to whom he handed a small envelope the contents of

which later tests showed to be heroin hydrochloride; that at 11:00 p. m. on September 10, 1958 he observed DiBella leave Apartment 42 at 35–15 80th Street, Jackson Heights, walk to Roosevelt Avenue and 74th Street, where he met Panzarella, and then walked with him to 76th Street near Roosevelt Avenue, where they separated, after which Panzarella met Agent Moynihan and sold him an ounce of heroin hydrochloride, which he stated he had obtained from Di-Bella.

■ It is evident from these statements that Agent Costa had personal knowledge of the events which led to DiBella's arrest. He so stated in the affidavit which he submitted in support of the application for the warrant which was issued by Commissioner Epstein on October 15, 1958 and executed on March 9, 1959.

The facts in this case are infinitely stronger than those in Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503, cited by the defendant in his brief. There the names of the witnesses were left blank in the complaint on which the warrant was issued, and the agent testified that when the warrant was issued "his suspicions of the petitioner's guilt derived entirely from information given him by law enforcement officers and other persons in Houston, none of whom either appeared before the Commissioner or submitted affidavits" (357 U.S. at page 485, 78 S. Ct. at page 1249). The Supreme Court there held that this complaint was "defective in not providing a sufficient basis upon which a finding of probable cause could be made."

In the case at bar Agent Costa had had the defendant under observation. He saw him meet Panzarella on two occasions, after which the latter made sales of heroin to Agent Moynihan. The complaint names Panzarella as a person who made statements in the case, and alleges that the sources of the agent's information were his "personal observations in this case, the statements of Samuel Panzarella, and other witnesses in this case

and the reports and records of the Bureau of Narcotics." The facts in the case at bar are similar to those in the case of Lathem v. United States, 5 Cir., 259 F.2d 393, at page 398, where the Court said, "Here, it is clear that Slotnik had personal knowlege, based his charge on knowledge, not belief, and that the complaint is an affirmative statement from an affiant with personal knowledge. Unlike the Giordenello case, the Commissioner could determine whether there was probable cause for issuance of the warrant. He did not have to accept a mere conclusion." In my opinion the complaint herein was sufficient and the warrant was properly issued thereon.

■ However, quite apart from the question of the propriety of the issuance of the warrant, Agent Costa had grounds for believing that DiBella had committed a violation of the Narcotics Acts sufficiently reasonable to justify his arrest without a warrant. Section 7607 of Title 26 U.S. Code, states that among others, Agents of the Bureau of Narcotics may "(2) make arrests without warrant for violations of any law of the United States relating to narcotic drugs (as defined in section 4731) or marihuana (as defined in section 4761) where the violation is committed in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation."

In the recent case of Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L. Ed.2d 327, an Agent of the Bureau of Narcotics in Denver arrested the defendant without a warrant after having been advised by one Hereford, a "special employee", that the defendant was peddling narcotics, that he had gone to Chicago to purchase heroin, and would return to Denver with it on September 8 or 9, 1956. Hereford gave the Agent a physical description of the defendant and the clothes he was wearing, informed him that he would carry a tan zipper bag, and that he habitually walked fast. On the morning of September 9th the Agent saw a person answering that de-

scription and carrying a tan zipper bag, alight from an incoming Chicago train at the Denver station and walk quickly toward the exit. The Agent, accompanied by a police officer, arrested the defendant, searched him and found two envelopes containing heroin clutched in his left hand in his raincoat pocket. The defendant attacked the arrest and subsequent search and seizure as violative of the Fourth Amendment, in that the information given by Hereford to the Agent was hearsay and could not be considered by him in determining whether there was probable cause, and that the Agent's information was insufficient to meet the test of "probable cause" and the requirement that there be "reasonable grounds for believing a violation had taken place."

The Supreme Court rejected both arguments. It held, at pages 311 and 312, of 358 U.S., at page 332 of 79 S.Ct., that Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879, had decided that there was " 'a large difference between the two things to be proved [guilt and probable cause], as well as between the tribunals which determine them, and therefore a like difference in the *quanta* and modes of proof required to establish them.' 338 U.S. at pages 172, 173, 69 S.Ct. at page 1309." The Agent, therefore, they held, properly considered Hereford's information, even though it was hearsay, in arriving at "probable cause."

The decision went on to say at page 313 of 358 U.S., at page 333 of 79 S.Ct. " 'In dealing with probable cause, * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' Brinegar v. United States, supra, 338 U.S. at page 175, 69 S.Ct. at page 1310. *Probable cause exists where 'the facts and circumstances within [the arresting officer's] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed.* Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543." (Emphasis added.)

In the case of United States v. Walker, 7 Cir., 246 F.2d 519, at page 527, Circuit Judge Finnegan reviewed the whole field of the law respecting arrests without a warrant, and stated, " 'Reasonable ground,' then, is the litmus paper for testing validity of arrests without a warrant. Implicit in such test is the exclusion of arbitrary and capricious interference with individual freedom. Dignity and sanctity of the individual are not to be jeopardized by the whim or zeal of policemen. Consequently organic law, reflected in the relevant statutes and Rules of Criminal Procedure interposes the judiciary between law enforcement officers and citizens by requiring, as normal procedure, application for warrants and the attendant opportunity for the judicial branch to pass on the question of probable cause. This constitutional insulation against infringing basic rights is removed only under classes of exigencies which have been judicially approved on review and now form a discernible pattern of instances, excusing law-enforcement officers for by-passing the requirement of having the judiciary first rule upon the question of probable cause. In those situations the law is adjusted and imposes on the law enforcement agent a standard of discrimination. Rather than blind worship of cause alone, the law probes for the basis of the officer's action measuring it by an external standard. After all when an arrest without a warrant is classed as valid, it simply means such action is judicially tolerated as being within the constitutional bounds of reasonableness as officially or pragmatically defined in case-law. Fresh combinations of facts must necessarily be examined under the terms labelled 'probable cause' and 'reasonable grounds' for neither one is a static concept. But the criteria embedded in each continues to be one that refuses approval for arrests without a warrant where an officer is stimulated by an *inkling only. For he must act as a*

*man of reasonable caution. 'Suspicion' is an elusive word with a wide spectrum of intensities and courts must examine the facts underlying it rather than be deflected by the word itself."* (Emphasis added.)

It is my opinion that the evidence in the possession of Agent Costa was more than sufficient to give him reasonable ground to believe that DiBella had violated the Narcotics Acts on August 26, 1958 and September 10, 1958, on both of which occasions he had *personally* observed him meet Panzarella immediately prior to the sales of heroin to Agent Moynihan, about which he was told by the latter, who is clearly a more reliable source of information than were the informers in the Draper and Walker cases, supra. Agent Costa could, therefore, have arrested the defendant DiBella without the warrant on March 9, 1959.

The arrest having been properly made, I find that the search incident thereto was proper, and that the evidence resulting therefrom was not illegally obtained.

The motion is in all respects denied, without prejudice, however, to a renewal thereof on the trial.

Settle order on notice.